Just for a short moment, we'd like the attorneys on the Bengali matter to take the counsel table. And then we'll be, we don't leave your stuff there. Just have you can leave it there. It's only going to take a couple minutes. Mr. Hart. I don't believe. All right. And are you with? I'm Melissa Ryder. I'm with Williams Montgomery and John. We represent the defendants All right. Whatever you want. Okay. All right. Justice Taylor has a statement that he wishes to make for the record, but I think it'd be best if we wait for Mr. Hart. All right. So we'll be back with you in a few minutes. We're going to take a short break. We'll be back in just a couple minutes to do the Brooks matter. All right. Thank you. And let's just have the counsel approach to the podium on the Bengali matter, please. Mr. Hart, you can stay where you're at if you'd like. We're just going to have a short announcement with regard to Bengali. You can certainly take any position you want. Everyone's present? Justice Gould. Yes. Good morning, everyone. As I was reading the briefs, it occurred to me that somehow I knew this case. And as I finished the briefs, I finally realized that back in January, December, I was at a fundraiser for brain tumor foundation in Lake County. I was speaking with former U.S. Attorney Fred Foreman and the state's attorney in Lake County, which was Mike Waller. 38 years ago, I was their law clerk. While we were doing that discussion, Larry Ruder came up to the table and he was playing and he was donating his time for the band for part of that foundation. He spoke about this case. I don't recall what he talked about. It would have absolutely no effect on any opinion that I would give in this case. I know I can be fair to all parties, but for the fairness issue, I wanted the defense to know that. And that if they have any reservations regarding me hearing this case, I will recuse myself today. The oral arguments would continue and the presiding judge would appoint another justice to hear the case. So while they're discussing this other case that was supposed to start at 1030, I want the defense to discuss it, even if the plaintiff has an issue. I'll gladly recuse myself. All I need to know is a note sent back to the courtroom, whether you want me to recuse myself or not recuse myself. I don't care who. I don't want to know who has any issues. All I want to know is whether the parties have any concerns with me hearing the case. Could you just indicate again when this took place? And it was for a brain tumor foundation. There's some kid up in Lake County that the family does this foundation every year, this fundraiser every year, and I attended it just as a patron in terms of supporting. And that's all I can tell you about it. I know my wife went there, so it had to be during the Christmas, probably January, is my best guess. Okay, I don't even recall the conversation to be honest with you, but I just knew when I was reading the briefs that this was familiar, that I had heard this from someone before. All right, so we're just going to reposition the panels and step out for just a second, and then we'll take up the Wolfe-Brooks matter versus Tooley. And during that period of time, you folks will have a chance to talk amongst yourselves, your clients, whoever you want to talk to, and we'll see you later. Thank you very much. All right, have a seat, please. Thank you for your patience. And call the last case, please. Case number 12-3760, Celia Bengali versus Alfred Bejjani. It's consolidating with case number 13-0624 and also 13-0729. All right. All right. Counsel, could you please identify yourselves for the benefit of the court? My name is William J. Kirk. I'm the attorney for the Bengali family. Yes? I'm Eric Ludman. I'm the attorney for the Bengali. Kida, would you be here? Alyssa Ryder, on behalf of the defendants and the police, and sitting with me at counsel table, but will not be arguing, is Nancy Williams and Barry Montgomery. All right. Have you discussed among yourselves the order of presentation? Mr. Hart? All right. Let's hear from Mr. Hart first, and then we'll hear from the intervener, and then we'll hear from the athlete. All right? And how much time should we expect? The athlete can have 15 minutes. The first two presentations will be 10, okay? Thank you. Before you begin, I appreciate everyone's confidence in allowing me to stay on the hearing of this case, but I just wanted for the record that no one objected. Thank you, Justice. No one objected. Thank you. Mr. Hart? Yes. Well, my argument is essentially the reply brief that I filed in the case, the argument that I made. And the first point is that the circuit court erred in permitting post-trial discovery regarding matters that were or could have been discovered before the case went to trial. There is no legal precedent for such discovery. Mr. Hart, let's get down to the bottom line here. Do you believe that this verdict should stand in favor of the parents and the siblings? Yes. Why? Because, Your Honor, the record is clear that the decedent was not married at the time. Where is there any evidence of that? Your Honor, the evidence is that there was on her body discovered the divorce papers at five years. Well, weren't those divorce papers proven to be fraudulent? Your Honor, that's what has been asserted, that these divorce papers were fraudulent. Your Honor, we also have a case that the so-called marriage by proxy was not valid. And this was testimony given by Dr. Wing in cooperation with Dr. Tesson in the post-trial motion. But, Mr. Hart, didn't they prove that it was avoidable, not avoid marriage? Pardon me? Didn't they say it was avoidable marriage, but no one objected to it within the two-month period. So it wasn't avoid marriage. Your Honor, it was either void or avoidable, either one. The fact of the matter is Bengali was appropriately the administrator of the estate. And as we assert, permitting post-trial discovery regarding matters that were or could have been discovered before the case went to trial. But the defense asked for continuance so that that discovery could have taken place, but the trial court denied it. The trial court denied the discovery. Three judges, including Judge Lynch, who was the trial court in this case, denied the continuance. So the entire case went forward and judgment was ultimately rendered in favor of the plaintiffs. And a $4.250 million judgment was entered. There was testimony of contributory negligence by Hama Sasoka, but, Your Honor, I stressed to you that the fact that three judges denied the request for continuance of the trial before it went to trial, including the trial court, is manifestly important in this case. And the fact that on this appeal there's not a whisper of anything with respect to the liability of the defendants in this case as to the underlying case. The whole case comes as a result of the post-trial discovery and Judge Lynch's remarks. I stress to you that when you review the record, and I don't want to take a lot of your time, I know you've reviewed the brief very carefully, I stress to you that the defendants had knowledge for five years before this trial of the question of the suggestion of the marriage. But they did nothing in those five years and only subsequently, just before the trial was to commence, did they suggest continuance, which was, again, denied by three judges, including the trial court. And we have cited cases, the Willing case, the Schaeffel case, and the Dera case, which suggest, Your Honor, very clearly that it was an abuse of discretion to allow this post-discovery. Plain, plain error under the circumstances. But what you're asking us to do here is to allow a verdict with all of these issues out there. I mean, how could we do that? Because the verdict and judgment were entered before any of these proceedings started. And post-discovery, which is obviously erroneous under the circumstances, given the settled law, Dera, and the other cases that we cite in point one of our reply brief, is emphatic in that respect. But didn't Judge Sulganik, when he was presented prior to trial with the motion to strike the trial date, didn't Judge Sulganik recognize when he made his finding and when he denied the motion, didn't he also recognize in his findings that it may become incumbent upon the trial judge to have a hearing to determine how distributions would be made based on these allegations? Yes, Your Honor. So wasn't that kind of a flag that was put up before the trial date that we might have to revisit this issue later? No. I really don't believe that. Under the circumstances, the trial court could take the position that there might be some consideration, but Judge Sulganik did not indicate that there would be post-trial discovery. He denied the continuance of the trial and set it for trial before Judge Lynch. It went before Judge Lynch, and Judge Lynch, after a hearing from all of the parties, denied the continuance, and the case went to trial. And there's not one word on appeal in this case that suggests there was any possible error in the underlying case. Well, I don't know that that encompasses all the arguments. Certainly the argument was made by the defendants that should the facts be that the intervener was actually the husband of the decedent, then there were many errors in the trial because, first of all, the decision of the trier of fact as to whether or not this was a suicide would be affected by the question as to whether or not this was a marriage that had gone bad and they were apart for a couple of years, and maybe the jury would have been more open to the question of whether it was a suicide if the jury was told that the intervener was the husband. So I don't know if you can say that there's no allegation of any error in the trial. They could have raised that issue. They didn't. But I suggest to you that there's no evidence that there was a suicide in this case. No, but you said that there was no argument on appeal in that regard. And I think there is an argument on appeal that this case would have to be tried over because if the intervener was shown to be the husband, then there would be a different strategy or at least a different take on the cause of death. Well, the testimony in the case was that Keita presented himself to Mr. Ruder before the trial of the case that he was the husband of Alice Sosoka. But, Your Honor, that became apparent that when he rejected that after he had Mr. Keita sign a retainer agreement and then rejected that and accepted the responsibility for the family. It's quite obvious why the decision of Judge Flinch was rendered. And we make that clear in our brief where he took judicial notice of the Malian... I'll read it to you. Corruption going on in North Africa, and quote, that's all the byproduct of corruption and a lack of property rights in that country. A lack of due process. A lack of respect for the courts and due process, which apparently has been brought across to this country by these two families. And all this is a byproduct of their culture and their society and the poverty that's there. Further demonstrates that it was clearer. I suggest to you that's judicial notice taken by Judge Flinch without any factual basis to that, in contrary to the testimony of Dr. Wing and Dr. Tassad. I don't know how much more time I have. You can go ahead and wrap up then. Huh? You can go ahead and wrap up. In any event, I believe the court's taking judicial notice was a host of facts, not an evidence, or not the proper subject of judicial notice. Consequently, the court's decision to vacate the jury verdict against defendants in favor of Hala, the innocent parents, and the suggestion that Bengali still has to experience a motion for sanctions before Judge Flinch makes absolutely no sense at all. He was perfectly innocent of anything in this case. Thank you. And I rely upon the court to relate it back. Well, you know, that would be a very good question, and it was taken up when we moved to intervene. Plaintiff opposed on the grounds of timeliness and cited case law, and the court granted the motion. Defendants asked that the motion be granted. It's the law of the case, and the defendants waived it, number one. Well, how did they waive it? Defendants waived it because they asked the motion be granted over an opposition citing that it was untimely, the very same factors to be considered later on. How long has it been since the case has started? When did the intervener find out about the case? When did they get involved? All of those were up when that motion was considered. The motion didn't have to be granted. The judge could have denied it and still gone on and had all of the same sort of information. Yeah, but the waiver that you're talking about that the defendant made here, is this a waiver that the court has to consider? Absolutely it's a waiver the court has to consider because the court itself, in granting the motion, rejected the argument that the intervention was untimely. Timeliness is required to intervene. By granting the motion, the court granted a waiver. It's the law of the case, and to go back on that is inconsistent. Well, I think the law of the case becomes whether you can relate it back, whether there's a case that says that you could relate it back under these circumstances. Do you have such a case? When you talk about relation back, we do have a case that is similar. We don't have, at least that I could see, a case exactly like this one. But we do have Boatman's, which is cited in my brief. And the Ninth Amendment complaint, they find to relate back long after the statute of limitations has gone past. Nine amendments. And they even let the case come back after being dismissed. So for the defendants to say we can't change one paragraph that just changes the name to Keita, when, as Plaintiff Appellant pointed out, they had in their possession a photograph with that marriage certificate from the day of the accident, five years later. Well, can't Judge Lynch have the right to revisit that decision? He still has jurisdiction over the case. Can he revisit that question? Judge Lynch could revisit the question if he had new evidence brought to the fore after he'd already made the decision. But he grants the motion to intervene. There's no new evidence due in between that time and the time that he makes the further decision. So it makes no sense. There was a whole hearing. There was a post-judgment hearing where he took into account evidence that was brought forward, and he ultimately came to the conclusion that your client committed a fraud on the court. And so wasn't his decision there? I'm not, you know, we can get to the question of whether that was correctly decided, but isn't that the situation where Judge Lynch, after hearing additional evidence, is revisiting his decision to allow the intervention? If there were additional evidence, the actual hearing was a motion hearing considering papers, testimony, and evidence that had already been submitted, together with argument, very good argument, from defense counsel that was adopted wholesale by the court. No new evidence was adduced at that hearing. It's important to recognize to the panel, and it's in my papers, that the court never called upon the parties to appear for a formal hearing where there would be viva voce testimony before the court. What about these depositions that he sat in on? Well, he did. He sat in on our client's deposition. Now, we go back and forth about how that's done. We agreed that we would produce him. Defendants said they'd subpoena him. We said, fine, he'll be there. And he was, and the judge was there by video link and heard our client testify and heard the interpreter say that our client has five years of education and can't read or write in any language. And notwithstanding that, made an argument that he was sly as a fox, wily, and somehow involved in a fraud. It just didn't add up. Judge Lynch also didn't say one word about the applicable standards in ruling on a motion to dismiss. First, you have to take all the evidence in the light favorable to the non-movement. That's Keita. He made every single inference he could in a manner that was favorable to the defendant at Appalee's position, every single one. Also, you have to have clear and convincing evidence of fraud. There was no doubt. There was clear and convincing evidence that Silabongalee, together with the family, committed a fraud upon the court. And that's why you can have post-trial proceedings granting the relief of getting rid of the damages in this case, because you have the wrong people testifying at trial. However, one witness, saying that he was getting 35% on cross-examination by plaintiff counsel, coupled with a delay for which other inferences could be made and vague notions that declined new things, is not enough to find fraud. Is it enough to raise a suspicion? Sure. But not to find it, not without further proceedings, and definitely not on the evidence that was submitted. So he didn't even give lip service to clear and convincing evidence. That is an abuse of discretion because it is unreasonable, and he didn't apply the proper judicial standard, which is why his decision should be overturned on that basis. His decision should also be overturned because, as we mentioned before, latency is a red herring. It's been waived by the court. That's our position on it. And if not, there are definitely inferences that could be made in a light most favorable to the non-movement. Also, the judge's decision frustrates the purpose of the Wrongful Death Act, which is to award damages to the surviving spouse or next of kin. And the true party and interest in the case is that person, not Silabongile. So even if the court wanted to say Silabongile committed fraud, this whole thing should go out the window, that frustrates the intent of the act because he's not the true party and interest. Key to this, Judge Lynch found he was, which is why it makes perfect sense to grant a motion to amend the complaint and to allow it to relate back based upon the one case that has anything to do with this situation that anyone has cited. So what is it that you want us to do? Under the circumstances, we'd like you to reverse the decision and send the case back for a new trial. On liability also? Well, defendants make a point that they could raise the issue as to how a state of mind. I can't take issue with that. I can only say that there were multiple witnesses to liability, none of them were the witnesses as to damages, and that a jury found that the defendants were mostly responsible. And their last venture with mention or plea in the record claiming suicide didn't go so well for them. So if the court wishes to send it back for a motion on both, that is, court is welcome to do so. We say that it makes no sense for a Cook County jury to hear a case on liability that's already been decided. It'd be a simple matter to tell them liability is not an issue in this case. Your sole responsibility is to determine what damages are owed to Namukita as the husband of the deceased, if any. All right. Thank you very much, counsel. All right. Let's hear from the defendants. Yeah, please. Before you start, I have a question. I'm sorry? Before you start, I have a question. Okay. Show me where is the evidence that the husband committed a brawl here? Well, there was a lot of evidence, and Judge Lynch spells it out in his final ruling when he decides. I read all the depositions, and I read everything he said, and I didn't see it. So maybe you could get it into my head. Show me where it is. So Judge Lynch summarizes it, but this is what the evidence is, and there's a lot of evidence, is that according to Kita's own testimony, he knew about his wife's death within a couple of days, a few days of the accident. He spoke to Mr. Bengali about filing a lawsuit. He knew that there had been an Indiana suit filed and that he had been left off of it. Isn't this basically an illiterate man? The testimony and the facts show that he was illiterate, but his own testimony also showed that he's a cab driver who was savvy enough to know within a short time after the accident occurred that they ought to pursue a lawsuit, that he looked into it, that he spoke with Bengali about filing a lawsuit, that he knew the Indiana action had been dropped and that an Illinois action had been filed, that he was concerned about that Illinois action going forward without him. And all that's a fraud? Well, the fraud, it all comes together when you find out that Kita spoke with Thera, who is a family friend. He was concerned that he wasn't being informed about the suit. Thera testifies that there was a deal that there be a 35% kickback. But not to the husband? Well, he doesn't specify who that's to, but he just talks about a 35%. That's a finder's sheet for him. That's one way of viewing it, but he doesn't – there's no testimony that rules out that it was for Kita as well. Well, whose burden is it to show fraud? I mean, does Kita have to rule out fraud? Or doesn't somebody have to prove it by clear and convincing evidence, as counsel just told us? Well, I think the clear and convincing evidence concept is a bit of a red herring because we have to keep in mind the context in which all of this arose, which was this is in January 2013, where the judge had ruled in December of 2012 that Kita was the husband. Now in January 2013, we're trying to figure out what should happen as a result of that ruling. And this all comes up in the context of the defendants moving to vacate the judgment and Kita asking for leave – well, Kita asks to vacate and for a new trial on damages and implicitly asking for leave to amend the complaint so that he be named as a beneficiary and as the administrator. And it's in that context that defendants responded and said he doesn't admit, he doesn't satisfy the conditions for allowing an amendment for various reasons, but one of which is if you look at Section 2-616C, which is the section he was trying to use, you have to show three things, that an amendment would further the ends of justice, that you have to look at the effect it would have on the nature of the proof to defend the claim and the surprise or the prejudice by the amendment. But you see, that's a separate issue. The amendment issue is separate from the fraud issue. Those are separate issues. To have evidence of fraud is by clearing convincing evidence and what you've told us is speculation, not evidence. Relating back, that's another question. Well, I would disagree that it was speculation because there is evidence about Thera attending the trial, about Kita being informed about the trial, about Kita knowing the trial was going forward, about there being some sort of 35% kickback, about the father, Howa's father telling Thera, you better ask Kita because he knows stuff. There may not be direct testimony by anyone that Kita was part of it. Circumstantial evidence could be clear and convincing evidence. Yes, and as a matter of fact, in this suit, the jury instructions, if you look at Record Volume 8C-1778, the jury was instructed that circumstantial evidence should be given the same consideration as other evidence. And that's the law. And so, yes, the circumstantial evidence can reach that level. But you have a case, I don't care what state of the union it's in, that will say that circumstantial evidence alone can be clear and convincing evidence to prove fraud. I haven't looked for such a case. You could look. You won't find it. But irrespective of the fraud issue, my point is that in order for Kita to be allowed leave to amend, he had to show that an amendment would further the ends of justice. I'm not saying that you're wrong about that, but the question of fraud is a separate question. You want to get into the amendment? I understand, but the point I want to make is that the very same facts that led the court to find that there was a fraud were also the facts that proved why an amendment would not further the ends of justice. The Wrongful Death Act, as counsel said, the Wrongful Death Act looks to compensate the survivor. And if it turns out that the survivor has not been compensated, how would not letting him into the case and becoming a plaintiff not further the cause of justice? Because Judge Lynch found that Kita had been latent. And even if you find that he wasn't part of a fraud per se, which we believe he was, but even if you don't want to go that far, Judge Lynch also said that Kita's inattentiveness, his latency, the facts are undisputed that Kita knew about this lawsuit. He knew that it was going forward and that he did not pursue his rights. And his latency was prejudicial to the defendants. And so on that basis alone, there is sufficient grounds to find that the amendment, the denial of the amendment, was not an abuse of discretion and that an amendment would not have furthered justice. I do want to correct some of the misstatements that were made or clarify things. Mr. Hart said this morning that there were divorce papers found on Howa's body at the time of the accident. That's incorrect. It was the burned marriage certificate. And there's been a big point made about that this was in the defendant's possession all that time. But I would ask the court to take a look on the record at record five, page C1027. And you can get an idea of the piece of paper, the papers that the defendants were looking at, which was a charred document in a foreign language which the investigator had labeled birth certificate. And most importantly, the defendants had no reason to look beyond that and to question it because within months of the complaint being filed, the defendants, acting with due diligence, propounded discovery to the plaintiff and asked two questions. Whether Howa was married at the time of the accident and whether she had ever been married. And the plaintiff swore in answers to interrogatories that she was not married and she had never been married. The idea that the probate court filing could be justified because the marriage was never legitimate, that's just disingenuous because when the plaintiff's counsel was advised in October 2011 that the defendants had discovered this marriage and that she knew about it but it wasn't a legitimate marriage and so she's not married, their response was to produce this now admittedly fraudulent divorce decree, which Judge Lynch appropriately found was evidence that the plaintiffs did believe that there was a valid marriage all along. Because if they didn't, they would never have produced this divorce decree in order to try to pursue their case. Let's talk for a second about the procedures utilized during the post-judgment discovery phase. I'm a little bit troubled by the use of the depositions that were taken post-judgment as evidence because we have a very clear demarcation in our state between discovery depositions and evidence depositions. So my question is how do we justify the use of the statements made in those depositions that were taken post-judgment as evidence? Well, all of those depositions were evidence depositions. So they were properly used as evidence. In fact, that's one of... Well, how do we know they were evidence depositions? Well, they were noticed as evidence depositions. And in fact, there was argument made by the plaintiff during some of these depositions that they wanted discovery depositions first of all. So by their own position, they acknowledge and agree that these were all evidence depositions. And Judge Lynch realized, this is post-trial discovery. It is a bit unusual situation. And so he tried his best during these post-trial proceedings to come up with a way of handling it, which was efficient, which was cost-effective, which would limit the scope, which the Shapo case tells us that there should be limited post-trial discovery. So he was trying to limit that. And he decided that the depositions would be handled as evidence depositions. He would attend all of the depositions. And so he personally observed all of these witnesses. And so all of that was brought to his attention. And he said, well, if you don't mind, I'd like to be a part and parcel of the eventual evidentiary hearing on December 13th. Judge Lynch had sat in on all of the evidence, with the exception of Mr. Kita, who testified via video link. And Judge Lynch sat in live during that deposition as well. But Judge Lynch also tried to give the parties as much leeway as they needed to do all of the discovery they needed. And I'd like to point out that the plaintiff's counsel did not notice these depositions as discovery depositions first. We, for example, Mr. Awad, we noticed it as an evidence deposition. And so the complaints now are too late. Mr. Hart was concerned about some of Judge Lynch's comments about Mollie and the corruption in Mollie. I would point out to the court that Judge Lynch made those comments not as suggested for no reason. But based on, and I believe that this morning it was suggested that he had no facts to support it. But it was just the contrary. The judge did have facts to support it and testimony to support it, not the least of which was the plaintiff's own purported expert, Ms. Wing, who testified to the corruption in Mollie. And in fact, in the initial brief of Mr. Bengali, he quotes, he discussed that there's a huge problem in Mollie about people not knowing if they're entering into legitimate marriages. So this issue of there being fraud in Mollie, this is no evidence of any sort of bias or impropriety on the part of Judge Lynch, but a response to the testimony that was given, including testimony of Witness Thera, who discussed that there's rampant corruption in Mollie. I do want to respond to this concept that the intervener brings up, that there was some sort of waiver as to the issue of timeliness. I think we're mixing apples and oranges there. There were two different issues. There was an issue about whether KETA should be allowed to intervene. That was raised and briefed in August of 2012. And at that August hearing, Judge Lynch decided not to make an intervention. He said, no, we're not going to intervene. We're not going to make a ruling. He said he was going to defer ruling. And at that time, the Plaintiffs' Council did discuss that they believed that the intervention wasn't timely. But that was put over and the judge didn't make a decision. The issue of intervention didn't come up again until the end of the December 13, 2012 airship hearing. And at that time, the judge had already decided that KETA was the rightful heir. And if you look at the transcript, and I can get the site in a moment, oh, here it's in record volume 31, page 99, there is no discussion about timeliness then. The Plaintiffs' Council essentially says, well, I guess now that he's the heir, you're going to let him intervene. And the defendants at that time say, okay, he's been sworn to be the heir, let him intervene to make the arguments he's going to make. But we don't agree with the merits of his arguments. So there was no waiver of the issue of amendment. Now, as to the timeliness issue, that in itself, of course, there's two different standards for whether you intervene. And then a whole different set of issues as to whether you should be allowed to amend. But even as to the timeliness issue, which does impact both of them, the timeliness issue has to do with the time between the lawsuit being filed and the time you intervene. Timeliness in terms of the amendment deals with the time of the accident and when you're seeking to amend. So we're talking about two different periods of time. But even more importantly, we're really talking about two different issues. The intervention, you're looking more at the timing. The amendment, the court was looking at KETA's latency, which was something beyond timing, which was the fact that he had purposefully, knowing that this lawsuit was going forward, stayed in the weeds, did not assert himself, and it was strategic. And it was only after the plaintiff had to tacitly concede or expressly concede by their expert, Tasugu, that this divorce decree was a fraud. It was only then that KETA stepped forward. And that was the issue the court was considering in terms of the amendment, which is a different thing than the timing for the intervention. I think at the very beginning of the oral argument this morning, Justice Gordon asked an excellent question, which was, should this verdict stand? And if we look at the deferential standard that we have to view Judge Lynch's actions, who saw all these witnesses testify at trial and sat in on all the witnesses' evidence depositions after the trial, and we ask, did he use conscientious judgment and was his decision outside the bounds of reason, we have to say that he did not abuse his discretion in allowing the defendant to testify, in allowing the post-trial discovery, in making the rulings that he made. And if we look at the standard for his findings as to airship, was it against the manifest weight of the evidence? Well, certainly his findings were not unreasonable or arbitrary. They were based on the evidence and they were well considered. And so the verdict should not stand, and you should affirm the rulings and the dismissal. Thank you, Counsel. Mr. Hart, do you have anything else? You can speak from wherever you wish, Mr. Hart. The comment that Judge Lynch has given about the policy is not based on any evidentiary issue. It was just on the imposition of what was happening in the country. And I think that's one way that can be settled. I can only state to you that it's all the byproduct of corruption and the lack of property rights in that country, the lack of due process, the lack of respect for the court and due process. Apparently it's been brought to this country by these two families, and all this is a byproduct. Their culture, their society isn't positive. But their verdict demonstrates that this is a very serious issue. That comment with respect to public policy is important, and I make a response to the testimony in the case with respect to the accepting representation for Mr. Pena, and initially agreeing to 35% go back to him with respect to the family. Now, I stress in this case, and in the record on this case, there's not one word actually about the ultimate accident in the case which led to the war point. I can say to you that they have not asserted anything with respect to that. It was only at the time of the beginning of the trial that they asserted this question of fraud. Now, I want to stress that there was retained before Judge Lynch the motion for sanctions against Bengali, who did absolutely nothing wrong in this case, that as the administrator for the family, I was supposed to soak up, that we could feel also that that should not be under-reported. We're all alone. Thank you, Mr. Hart. Counsel, do you have anything else? Yes. Two minutes, please. I just want to address what the defendant appellant had to say about purposefulness on the part of Pena and any latency. And again, I think we need to look to the burden of proof here, and I don't think there was any proof that any latency was purposeful. I think also it's important to point out that Judge Lynch does appear, the court does appear, to have lumped Mr. Keita in with the family and Mr. Bengali and everything that happened. Having been the trial judge in this case, one can understand he would be appreciably perturbed by the results in this case. And unfortunately, I do think that in the end it resulted in abuse of discretion, not applying the right judicial standards. The defendant's keyed on the latency question for a good deal of their argument. So I guess the question that I have to throw at you is, so I guess, was it five years? It was some time. From the accident until he sought to intervene? It was five years until he moved to intervene. Okay, so I guess the question, where was he for five years? I would say actually in 2011, he was brought in by Mr. Reuter, who signed a retainer agreement with him, made a motion to replace him as the heir, so I would say we have to run from that time period. And that was what time period? That was, I believe, November of 2011 or thereabouts until August of 2012. If you go by the time that he intervened, as opposed to when he secured counsel and counsel sought to call. Well, let's give you the benefit of the doubt. Let's go back to when he secured counsel. So from the accident until the time he goes to see Reuter? That's a fair amount of time. And how much is it? I'm sorry? I have to do the math. Let's see, from November of 2011 to November of 2012, and that would be 12 months. We take away from that six, so about five months or so. Not as long as defendants would have you leave. Mr. Keeter resides also, it's important to remember, in the Bronx. They like to talk about him as a taxi driver. I want to make sure I get this right. From the time of the accident until he goes to see Reuter is how long? That's a fair amount of time. What is a fair amount of time? I mean, I know the record will show that. It's about four years and change. Okay, so the question that we have to answer, if we're to allow Keeter back in the case, where was he for four years? And how do we justify that? To put it in a better legalese, how do we relate back? Basically, he thought that he was going to be in the case. He finds out later on he's not, calls up Reuter, what's the deal? Here I am, I'm the husband. Reuter says, fine, come in. How does he come to the conclusion that he was going to be in the case before he goes to see Reuter? Mr. Keeter is an illiterate man from Mali who relies upon other people, like Howard's uncle, to take care of things for him when he doesn't reside in Chicago. He came out for his wife's funeral, spent time for that. And yes, since his wife was killed, he did want to get justice and compensation for that. But he thought, wrongly, that his interests were being taken care of by people that he thought he could trust. And that turned out to be an error. One of those people, at least for a few days, was plaintiff's counsel, signed a retainer agreement, and then, faced with a fraudulent divorce decree, drops him, says, I'm not going to represent you, and then tells defendants, no, you can't talk to him, blocking the only party's access from him to tell him that the trial is going to begin in this case. So, afterwards, he finds out and does what he should. Retains a lawyer, who immediately becomes involved, starts talking. He appears for a deposition in June of 2012, before the divorce decree was abandoned. And, you know, I think the whole idea about the divorce decree being abandoned is a red herring, because Intervenor has maintained from the beginning that he is the heir, and the divorce decree was fraudulent. There's testimony that he told Bruder that. He's not getting involved, waiting until that's happening. What you have is a normal judicial process, a normal process, where you come into a case, and you see, can we resolve this? Is this going to be resolved? No. Okay, we have to do what we have to do, and we did. So, I don't think that the latency or delay is as long as we're making it out here to be, and I think the end result is something we need to be mindful of, the purpose of the wrongful death statute in compensating the heir. Thank you. Thank you, counsel. The court wishes to express to all counsel its appreciation for your patience today, and also for your very engaging and well-developed arguments. It's obviously a fascinating case, and we will take it under advisement. Thank you very much. The court is adjourned.